# REPORTS OF CASES

DECIDED IN

# THE SUPREME COURT

OF THE

## STATE OF WASHINGTON.

[No. 2115. Decided June 18, 1896.]

THE STATE OF WASHINGTON, *Respondent*, v. M. H.
NICHOLS, *Appellant*.

CRIMINAL LIBEL — INSTRUCTIONS — SUFFICIENCY OF INDICTMENT.

In a prosecution for criminal libel it is not error for the court to
charge the jury that "the publisher of a libel is presumed to intend
what the publication is likely to produce," although §17 of the
Penal Code, defining libel, may omit any reference to the matter of
malice or intention constituting an element of the crime.

The fact that oral instructions were given to the jury in the
absence of defendant cannot be urged on appeal when it does not
appear from the record what the instructions were, nor from any
source that they were prejudicial, nor that the matter was called to
the attention of the court upon a motion for a new trial.

An indictment for criminal libel, which sets forth the libelous
article and charges defendant with " thereby *intending* to provoke
[the person libeled] to wrath, and expose him to public hatred,
contempt and ridicule and deprive him of the benefits of public
confidence and social intercourse," is sufficient, although the statute
defines libel as " the defamation of a person . . . *tending* to pro-
voke him to wrath, or expose him to public hatred," etc.

Appeal from Superior Court, King County.— Hon.
T. J. HUMES, Judge. Affirmed.

*Winsor, Bush & Morris*, and *John Wiley*, for appel-
pellant.

*A. W. Hastie*, Prosecuting Attorney, *W. W. Wilshire*, and *J. T. Ronald*, for The State.

The opinion of the court was delivered by

DUNBAR, J.—The appellant was convicted of the crime of libel, and from the judgment of conviction appeal is taken to this court. The indictment, omitting the formal part and commencing with the recital of the libelous matter charged as being published, is as follows :

"SEATTLE, WASH., April 20, 1894.
"I first became acquainted with Rev. T. B. Ford in 1872 at the St. Louis Conference of the M. E. Ch., where I was appointed to Pine Bluff, Ark., a new charge organized by Ford. The male members were mostly 'pothouse politicians' of the lowest type most of whom did not pretend to be moral, much less christian. By misrepresentation of the character of his work to Bp. Scott, Ford got himself appointed P. E. of a district.

"In the spring of 1873, Ark. was organized into a separate conference with three districts, and J. H. Gillan, R. W. Hammett and T. B. Ford as presiding elders. Before going to confce., I learned that Hammett had embezzled some of the young preacher's missionary money. At the confce. I learned that one D. W. Calfee, whose money had been withheld, intended to arrest Hammett's character. When the Fort Smith Dist. was called, I inquired of a young preacher by the name of Smith as to the reason of the absence of Calfee. He replied, 'Calfee is afraid to come into the Ch. He is on the street. Gillam and Ford have ordered him to stay out until after Hammett's character passes, and have threatened his expulsion from the ministry and the Ch. in case of refusal.' 'Well,' said I, 'we will see whether these fellows can play that kind of a game in this confce.' So I arrested the passage of Hammett's character. This was at the organization of the confce.; so these gentlemen asked me whether I intended to join

the new confce., and, on being answered in the
negative, objected to my authority to make the arrest,
and were sustained by the authority of Bp. Bowman.
I never knew why Ford was so much interested in the
matter, until I came to California, where while attend-
ing the California Confce., Calfee informed me that
this embezzled money went to T. B. Ford, and
was used or claimed to be used, by him to pay the way
of another Ford while attending the Ark. Ag. & Mech.
College, under pretense of his preparing for the min-
istry in the M. E. Ch., when he did not belong to it.
If anyone interested doubts this statement, let him ex-
amine last year's missionary appropriations to paper
appointments on Seattle Dist., and interview the sup-
plies to learn how much missionary money they have
received.

"In 1884, I transferred back to Ark. Confce. Bp.
Bowman had told me in India while en route
from Bombay to Madras, that he had reduced Ham-
mett and Gillam to the ranks on this wise.   There
was a preacher by the name of Farmer, a graduate of
Boston Univ. & Theol. Semnry. down there against
whom Ford, Gillam and Hammett had trumped up
charges.   They got their rather pliant confce. breth-
ren who were a 'ringed, straked and speckled' lot
of fellows, to vote for a resolution admitting letters as
testimony.   The Bp. said he allowed them to proceed
without interposing any objection.   Before they could
proceed to the case of Farmer the Bp. said:  'Now,
brethren, I have sufficient testimony of this kind to
put the P. E's. of this confce. out of the ministry,
and of the Ch.'   At the same time unloading both
breast pockets of his coat and laying them on the
table before him.   'Now,' said he, 'go on with the case
of Bro. Farmer, and we will attend to your case after-
wards.'   They grounded arms and run up the white
flag.   Thereupon the Bp. deposed Hammett and Gil-
lam from the presiding eldership.   Hammett was not
a villain at heart, but lacked the force of character to
stand up against the villainy of others.   Gillam was
an opium eater, and occasionally would get drunk, as

Bro. Bushong of Oregon Conference could testify, and had, I think, at one time been a good man. But I never heard Ford accused of being anything but a scoundrel or something worse.

"Ford deserves a patent on a new method of making oneself a D. D. In 1884, Rev. G. W. Gray (now at the head of the Epworth League), was Prest. of the Little Rock university of the M. E. Ch. A conspiracy was brewing to drive Gray out of his position. It afterwards succeeded, and one Prof. Lewis, a nephew of Bp. Wiley, then a professor, was appointed by and with the consent of Dr. Rusk. The means used by Ford and his accomplices was a lie to this effect; 'That Dr. Gray had said in a lecture in Little Rock that he had traveled all over Arkansas, and taken pains to inform himself on the subject, and that there was not more than a wheelbarrow load of books in all the public libraries of the state.' What he did say was that there were not more books in all the common school libraries than would fill a wheelbarrow. Dr. Gray resigned, Lewis was appointed, and afterward being transferred to Chattanooga University, remembered his benefactor, who was thereafter to be known as a D. D. The method is certainly original, and Ford deserves a patent.

"After transferring from the St. Louis to the Southern Illinois Conference, and while stationed at Anna, Ill., I was told by an old man, a member of the M. E. Ch. that Ford, when a young man, and while in the ministry, seduced a young woman, hired or persuaded another man to marry her, and after the other man left her, married her himself, after a short interview in a smoke house. This account was confirmed by D. W. Calfee, with additional particulars. And while in Little Rock in 1884, I was told by leading men of the city, formerly members of the M. E. Ch., that Ford had an illegitimate heir in Arginta, opposite Little Rock, and across the river from it.

"These facts I give just as they were given to me, or as they are personally known to myself. I think that

the interest of public morals, and the cause of Christ,
demand that they be made public.

"(Signed)            M. H. NICHOLS,
·  "Care GEO. W. KNOWLES,
"Room 9, Llewellyn Dodge Bldg., Seattle."

"Thereby intending to provoke the said Rev. T. B.
Ford to wrath and expose him to public hatred, con-
tempt and ridicule, and deprive him of the benefits of
public confidence· and social intercourse, and he, the
said M. H. Nichols, at the time of the making, writing
and publishing of the said libel as aforesaid, knew
that the said libel was false and untrue, and in truth
and in fact, the said scandalous and libelous state-
ments contained in said writing are and were untrue
at the date and time of such writing and publication
as aforesaid.

"Dated at Seattle in the county and state aforesaid
this 22d day of September, 1894.

"JOHN F. MILLER, Prosecuting Attorney,
"By A. G. McBRIDE, Deputy."

The first error alleged is the refusal of the court to
strike out the testimony in regard to the sickness of
Mrs. Ivey. Considerable was said in relation to this
in the oral discussion of this case, but an investiga-
tion of the record shows that the court did substan-
tially strike out the testimony objected to and
especially admonished the jury that the matter under
discussion by the attorneys at that time had nothing
to do with the questions at issue; that it should be
disregarded by them absolutely.

· The seventh instruction, which is alleged as error,
was as follows:

"The intent with which a publication is made,
rather than its truth or falsity, is the correct criterion
by which a jury is to determine whether such a pub-
lication is a libel. The intention is a matter of infer-
ence from the nature of and the facts surrounding the
publication. The law presumes that every one intends
the necessary and probable consequences of his acts.

The publisher of a libel is presumed to intend what the publication is likely to produce. It is therefore as much a question of whether the tendency was injurious to the person of whom published, as to whether the defendant intended to injure the person libeled."

Sec. 17 of the Penal Code defines "libel" to be "the defamation of a person made public by any words, printing, writing, sign, picture, representation, or effigy tending to provoke him to wrath, or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse." It is doubtful, under this definition of the crime, whether the question of malice or of intention enters in, but in any event the concluding language of the court in the instruction objected to is but a logical result of the announcement made before, that "the intention is a matter of inference from the nature of and the facts surrounding the publication," and that "the law presumes that every one intends the necessary and probable consequences of his acts;" which is without question the law as a general proposition.

We think the court correctly instructed the jury in relation to privileged communications, and, considering the instructions as a whole, that the law was correctly announced to the jury on all the propositions.

The other assignment is that the court below erred in giving an oral instruction to the jury in the absence of the prisoner and his counsel, and without notice to them. It does not appear from the record what this instruction was, neither does it appear from affidavit or any other source that the instruction was prejudicial to the rights of the defendant, and in the absence of such a showing the judgment would not be reversed. But, in addition to this, it does not appear

that this question was called to the attention of the
court on a motion for a new trial, and for that reason,
if for no other, it will not be discussed here. In fact,
the record in this case is silent as to what the motion
for a new trial was based upon. The record shows
that upon the return of the jury the defendant in
open court gave notice of intention to move for a new
trial, which was on the 2d day of February, 1895.
The next and only reference to the question of new
trial is the following: "This cause being heard on the
motion of defendant for a new trial, the court on con-
sideration, both parties being present by counsel and
defendant in person, denies said motion. Exceptions
taken;" (signed by the judge). This was on March 16
1895.

The only question that has raised any doubt in the
mind of the court is the one embraced in the motion
in arrest of judgment, viz., that the facts stated in the
information do not constitute a crime or misdemeanor
or any other offense against the laws of the State of
Washington, in that it is not charged that the matter
published tended to provoke to wrath, expose to pub-
lic hatred, contempt or ridicule, or to deprive of the
benefits of public confidence and social intercourse
the person of whom it is alleged to have been pub-
lished. It will be noticed that the indictment does
not contain the averment that the publication of this
matter tended to provoke the said Rev. T. B. Ford to
wrath, etc., but the language is "thereby intending to
provoke," etc. We have examined the cases cited on
this proposition by both appellant and respondent,
and they all seem to be innocent of any information
on the subject under discussion here. We think,
however, that, under the provision of our statute
(Code Proc., § 1234) that "the indictment must con-

tain a statement of the acts constituting the offense in ordinary and concise language without repetition, and in such a manner as to enable a person of common understanding to know what is intended," this indictment is sufficient. The statement that it tended to provoke him to wrath, etc., would have been really the pleading of a conclusion instead of a fact. In any event it is not a necessary allegation when the libelous article itself is set forth in the indictment. This is not a case where the words in themselves do not import a slanderous meaning, and where an averment by way of innuendo is necessary, but a reference to the indictment will show that the words published were libelous on their face; that they were slanderous in themselves, and no other conclusion could be reached, either of law or of fact, than that their publication tended, if not to provoke the subject of the remarks to wrath, at least to expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse. In view of the language used in this publication, we think it would neither subserve justice, nor be in accord with modern authority, to hold the indictment insufficient on account of the omission of the phrase "tending to expose," etc.

Finding no error in the record the judgment will be affirmed.

HOYT, C. J., and SCOTT and ANDERS, JJ., concur.

GORDON, J., concurs in the result.